UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHAMA SEMMAMI, <br><br> Plaintiff, <br><br> v. <br><br> UG2 LLC and AGOSTINHO CORREIA, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No. 18-cv-12396-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                   **May 24, 2019**

**I.      Introduction**

Plaintiff Chama Semmami ("Semmami") has filed this lawsuit against Defendants UG2

LLC ("UG2") and Agostinho Correia ("Correia") (collectively, "Defendants") alleging violations

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII") (Counts I-IV) and

Mass. Gen. L. c. 151B (Counts V-X) and negligence (Count XI).  D. 1.  Defendants have moved

to dismiss.  D. 6.  For the reasons stated below, the Court DENIES IN PART and ALLOWS IN

PART Defendants' motion.

**II.     Standard of Review**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant

to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim

for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation

omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific

inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must

perform a close reading of the claim to distinguish the factual allegations from the conclusory legal

allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory

legal conclusions are not credited.  Id.  Second, the Court must determine whether the factual

allegations present a "reasonable inference that the defendant is liable for the conduct alleged."

Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint

must provide sufficient factual allegations for the Court to find the claim "plausible on its face."

García-Catalán, 734 F.3d at 103 (citation omitted).

### III.     Factual Background

The following facts are taken from Semmami's complaint and the Court accepts them as

true for the purposes of resolving this motion.

UG2 is a Boston-based facility services company that hired Semmami in 2017 to provide

cleaning services for its client Athenahealth.  D. 1 ¶ 16.  Semmami worked as a corporate cleaner.

D. 1 ¶ 2.  Semmami identifies her race as Moroccan-Arab and her national origin as Moroccan,

and she is Muslim.  D. 1 ¶ 3.

Prior to working for UG2, Semmami worked for UNICCO for approximately seven years

as a cleaning person.  D. 1 ¶ 15.  In or about March 2014, Janitronics, Inc. ("Janitronics") took

over the contract of UNICCO, for whom Semmami had worked, and hired her.  Id.  While working

for Janitronics, Defendant Correia was Semmami's manager.  D. 1 ¶ 18.  Alexi Ventura

("Ventura"), a non-party in this case, was Semmami's supervisor.  Id.  On or about September 1,

2017, UG2 took the contract over from Janitronics and hired Semmami.  D. 1 ¶ 15.  Correia

continued as Semmami's manager and Ventura continued as her supervisor.  D. 1 ¶ 20.  Correia

provided Semmami with her work assignments, evaluated her work and managed her schedule. D. 1 ¶ 22.  Correia also supervised Ventura.  D. 1 ¶ 24.

Semmami alleges that during her employment with UG2, she was subjected to "crude and offensive sexual conduct on a weekly basis."  D. 1 ¶ 36.  This conduct included Correia subjecting Semmami to "inappropriate sexual innuendo[s], questions, advances, touching, jokes, gossip, conduct, comments, and leering."  D. 1 ¶ 36.  Throughout Semmami's employment, Correia would tell her that she "looked and smelled good while leering at her and moving close to her to inhale." D. 1 ¶ 37.  Correia would "often cradle or hold his genitals over his pants while talking to [Semmami] and/or silently staring directly at her."  D. 1 ¶ 38.  Correia would also watch Semmami from dark rooms and surprise her when she entered the room.  D. 1 ¶ 40.  Semmami alleges that Correia's advances and harassment occurred "nearly every day."  D. 1 ¶ 42.  Semmami was afraid to be alone with either Correia or Ventura.  D. 1 ¶ 45.  Semmami alleges that other employees "tolerated and/or encouraged" Correia's advances.  D. 1 ¶ 41.  Correia "would frequently spend time in a locked bathroom with other female co-workers," which Semmami perceived as "sexual behavior," and Correia allegedly would later give these co-workers preferential treatment.  D. 1 ¶ 41.  Semmami "was often not provided with necessary cleaning supplies to perform her cleaning duties."  D. 1 ¶ 35.  She also "frequently requested additional and/or full-time hours."  D. 1 ¶ 29.

Semmami also alleges that she was "subjected to harassment, discrimination and retaliation because of her race, national origin[] and/or religion" and that her "employer's treatment of her was in marked contrast to the treatment of her non-Moroccan-Arab, non-Moroccan, non-Muslim co-workers."  D. 1 ¶ 49.  She alleges that because she is Moroccan-Arab and Muslim, she was "not held to the same standards as her co-workers to her detriment."  Id.  Specifically, Correia "would make disparaging comments about [Semmami's] national origin [and] religion . . . ."  D. 1 ¶ 50.

3

Semmami further alleges that "[u]pon information and belief, Defendant Correia dislikes Arabs, and possibly even Muslims generally."  D. 1 ¶ 52.  Semmami also alleges that in 2016, her Moroccan co-worker resigned from Janitronics because he was discriminated against and that his resignation was "at least partly due to [] Correia's treatment."  D. 1 ¶ 53.

In August 2017, Semmami filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") against Janitronics alleging that Correia treated her worse than her Hispanic and Cape Verdean co-workers due to her Moroccan national origin and Moroccan Arab race.  D. 7-2.  The complaint did not list any other bases for discrimination.  See id.

Semmami alleges the unlawful behavior continued after she filed her MCAD complaint. On or about September 15, 2017 (after UG2 took the contract over from Janitronics), Ventura followed Semmami down a hallway, raised his voice at her and told her to "shush" when she tried to speak.  D. 1 ¶ 25.  An unidentified employee at Athenahealth complained to UG2's Human Resources Manager about "the mistreatment of Plaintiff."  D. 1 ¶ 26.

On or about October 11, 2017, Semmami informed UG2 about Correia and Ventura's harassment of her, explaining that Correia had sexually harassed Semmami and created a hostile work environment.  D. 1 ¶ 30.  On or about October 23, 2017, Semmami met with two people in UG2's human resources department "about the harassment of Mr. Correia and Mr. Ventura."  D. 1 ¶ 59.  After a co-worker followed Semmami and called her a "dog" in Spanish, on or about November 1, 2017, Semmami spoke with one of the same people from Human Resources to report the incident.  D. 1 ¶ 60.  In her meetings with Human Resources, Semmami requested that Correia no longer be her manager.  D. 1 ¶ 61.  Semmami was told that she would have to request a transfer

and did so reluctantly.[1]  Id.  Semmami alleges that UG2 either did not investigate her reports or

"conduct[ed] merely a sham investigation" into Correia's behavior.  D. 1 ¶ 64.  UG2 did not take

any action against Correia and he continued as Semmami's supervisor.  D. 1 ¶¶ 67-70.

On or about December 13, 2017, an unnamed co-worker pushed Semmami as she was

punching in for the day.  D. 1 ¶ 72.  Semmami also saw one of her co-workers leaving Correia's

office and he said "something to the effect of 'leave her to me.'"  D. 1 ¶ 73.  The next day, while

Semmami was waiting to punch in, a co-worker told her to "watch [her] mouth" and waved his

hands close to her face while Ventura laughed.  D. 1 ¶ 74.  The following day, a man named Bob

called Semmami and told her she was suspended without pay.  D. 1 ¶ 75.  He did not say why and

directed Semmami to Human Resources.  Id.

Semmami received a letter dated December 20, 2017 explaining that she was being

suspended pending an investigation into complaints against her.  D. 1 ¶ 76; see D. 7-4.  The letter

reflected UG2's concerns about complaints from multiple co-workers that Semmami had used

"wildly inappropriate language in the workplace," thrown her identification and keys on the floor

at the end of her shifts and called one of her co-workers a "faggot, son of a bitch."  D. 7-4.[2]  UG2

wrote in the letter that the co-worker had interpreted the statement "as a hateful slur on his sexual

---

[1] The parties disagree about the specific transfer options given to Semmami and Defendants have submitted extrinsic documents to support their version of events.  See D. 7-3.  At this stage in the proceedings, where the Court must accept the factual allegations in the complaint as true, the Court considers and accepts that Semmami complained to UG2 about Correia and UG2 told Semmami she would have to request a transfer.

[2] Although Semmami did not attach the letter to her complaint, she expressly referenced the letter and its contents in her complaint.  See D. 1 ¶¶ 76-77.  The Court, therefore, considers the letter without converting the motion into one for summary judgment.  See Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (explaining that a court may consider extrinsic documents, including "documents sufficiently referred to in the complaint," without converting a motion to dismiss into a motion for summary judgment (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

orientation." Id. UG2's Human Resources Department interviewed Semmami on January 2, 2018.

D. 1 ¶ 81. Semmami briefly reiterated her complaints about harassment and retaliation and denied

making discriminatory comments to her co-workers. Id. Semmami "believes these false rumors

were spread in retaliation for her protected conduct." D. 1 ¶ 78. Semmami remained on unpaid

suspension until she was terminated on January 24, 2018. D. 1 ¶ 82.

## IV.    Procedural History

Semmami instituted this action on November 16, 2018. D. 1. Defendants have now moved

to dismiss. D. 6. The Court heard the parties on the pending motion and took the matter under

advisement. D. 16.

## V.    Discussion

As a preliminary matter, the Court addresses Defendants' arguments about Semmami's

parallel lawsuit against Janitronics, which she filed on the same day as this complaint. See

Semmami v. Janitronics, Inc., No. 18-cv-12397-RGS (D. Mass. Nov. 16, 2018), ECF No. 1 (the

"Janitronics complaint").[3] Defendants point to eight paragraphs of the instant complaint that are

identical to allegations in the Janitronics complaint. Compare D. 1 ¶¶ 36, 37, 38, 40, 41, 42, 44,

91, with Janitronics complaint ¶¶ 25, 32, 33, 36, 37, 47, 49, 101 (reflecting identical allegations).[4]

Defendants argue that the repetitive nature of the allegations in the two complaints "underscores

the implausibility of [Semmami's] claims relating to her employment with UG2." D. 7 at 3. The

fact that Semmami has asserted allegations against both UG2 and Janitronics in the respective

---

[3] The Janitronics complaint has been filed as an exhibit in this case at D. 7-1.

[4] Defendants also identify one page of the complaint in this case that appears to have been inadvertently transposed from the Janitronics Complaint. See D. 1 at 13 (skipping backwards in paragraph numeration from previous page and referring to "Defendant[] Janitronics"). The Court has not considered allegations that are asserted explicitly against Janitronics and not against the Defendants here.

complaints, however, does not preclude the Court from considering them against UG2.  The fact

of the overlap between allegations reflects the overlap created when UG2 took over the contract

from Janitronics and kept the same employees in place.    Accordingly, the Court rejects

Defendants' argument that it should disregard certain allegations solely because they are repeated

across two complaints, but considers, as discussed below, whether such allegations are conclusory

or otherwise insufficient for plausibly stating the claims Semmami asserts against UG2.

## A.    Sexual Harassment (Counts I and V)

Semmami asserts claims of sexual harassment in violation of Title VII (Count I) and Mass.

Gen. L. c. 151B, § 4(16A) (Count V) against UG2.

There are two types of unlawful sex discrimination under Title VII:  *quid pro quo* sexual

harassment and hostile work environment harassment.  See Meritor Sav. Bank v. Vinson, 477 U.S.

57, 65-67 (1986); Lipsett v. Univ. of P.R., 864 F.2d 881, 897 (1st Cir. 1988).  Although not entirely

clear from the complaint, the Court understands Semmami to be asserting both theories of liability.

See D. 1 ¶¶ 91, 104, 106.  To the extent that she asserts both, the Court concludes that she has

plausibly alleged a hostile work environment claim, but not a *quid pro* quo claim.  To state a claim

for *quid pro quo* sexual harassment, a plaintiff must show that "a supervisor condition[ed] the

granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate,

or punish[ed] that subordinate for refusing to comply."  Lipsett, 864 F.2d at 897.  Semmami has

not identified any condition of employment that was conditioned on sexual favors for Correia or

anyone else at UG2.  The only facts Semmami alleges to support this claim are that Correia would

frequently spend time in a locked bathroom with female co-workers, which Semmami perceived

to be "sexual behavior," and later provide these co-workers preferential treatment.  D. 1 ¶ 41.

Semmami does not specify what type of allegedly "preferential treatment" these women received.

With only these bare-bones allegations supporting her claim of a *quid pro quo* scenario, the Court concludes Semmami has not provided "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

As noted, the Court concludes that Semmami has stated a viable claim for a hostile work environment in violation of Title VII.  The elements a plaintiff must establish to succeed on a Title VII hostile work environment claim against her employer are:  (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.  Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 52 n.6 (1st Cir. 2010).

Two of these elements merit additional explanation.  The fourth element, severity or pervasiveness sufficient to alter the conditions of employment, "requires an assessment of the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting Harris v. Forklift Sys, Inc., 510 U.S. 17, 23 (1993)).  "Although offhand remarks and isolated incidents are not enough, '[e]vidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment.'"  Id. (alteration in original) (quoting O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001)).  The sixth element, employer liability, is

present when a supervisor's harassment of an employee results in a "tangible employment action against the employee," making the employer vicariously liable for the "actionable hostile environment created by [the] supervisor." Agusty-Reyes, 601 F.3d at 53 (alteration in original) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)). "Employers are also vicariously liable for a supervisor's 'severe and pervasive' harassment that does not result in a tangible employment action" if the defendant employer cannot show both "(1) that its own actions to prevent and correct the harassment were reasonable and (2) that the employee's actions in seeking to avoid harm were not reasonable." Id. (citations and internal quotation marks omitted).

The Court concludes that Correia's allegedly hostile acts towards Semmami constitute the type of recurring "sexual remarks, innuendos, ridicule, and intimidation" that is sufficient to support a claim for hostile work environment. Valentín-Almeyda, 447 F.3d at 94. As explained above, the Court rejects Defendants' argument that the Court should ignore these allegations because they are repeated in the Janitronics complaint. The Court concludes that the totality of the facts alleged in the complaint could be plausibly read as conduct so frequent, severe, physically threatening and humiliating as to unreasonably interfere with Semmami's work. The alleged conduct was both subjectively offensive to Semammi and could plausibly be seen as objectively offensive by a reasonable person in Semmami's shoes. It is unclear from the complaint if Semmami alleges that Correia caused her to be terminated or suffer another adverse tangible employment action in connection with his sexual harassment of her. The complaint, however, plausibly alleges that UG2 did not take reasonable measures to prevent the harassment and that Semmami took reasonable steps to avoid the harassment, such as reporting the behavior to Human Resources and requesting a transfer to get away from Correia. The Court therefore denies

Defendants' motion to dismiss as to Count I to the extent that it asserts a hostile work environment claim.

Defendants have also moved to dismiss Semmami's state law claim for harassment (Count V).  To establish a claim for sexual harassment under Mass. Gen. L. c. 151B, § 4(16A), a "'plaintiff [is] required to demonstrate that she worked in a sexually hostile environment that interfered with her work performance.'"  Horney v. Westfield Gage Co., 77 Fed. App'x 24, 28 (1st Cir. 2003) (alteration in original) (quoting Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411 (2001)).[5] For the same reasons as explained above, the Court concludes that Semmami has stated a plausible claim for sexual harassment under Chapter 151B.  See Muzzy, 434 Mass. at 412 (analyzing a state and federal law claim for sexual harassment under the same standard).

**B.      Gender Discrimination and Harassment (Counts II and VI)**

Semmami asserts claims of sex and gender discrimination and harassment in violation of Title VII (Count II) and in violation of Mass. Gen. L. c. 151B, § 4 (Count VI) against UG2.  To the extent these claims are intended to articulate sexual harassment claims, the Court finds them to be duplicative of Counts I and V for sexual harassment.  To the extent they are intended to assert a claim for gender-based disparate treatment, the Court addresses that claim here.

Absent direct evidence of discrimination, courts apply the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to disparate treatment claims under both Title VII and Chapter 151B.  Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996); Yee v. Mass. State Police, 481 Mass. 290, 294 (2019).  Under the McDonnell Douglas framework, a prima facie case for discrimination for disparate treatment involves a four-part test:  "(1) the

---

[5] Defendants stated at the hearing that they were not arguing Semmami had failed to exhaust her administrative remedies.

plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action . . . ."  Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011).  This prima facie burden is not an onerous one to satisfy.  Caraballo-Caraballo v. Correctional Adm., 892 F.3d 53, 57 (1st Cir. 2018).

Here, Semmami has alleged that she "was treated differently as to the terms and conditions of her employment based upon the sexual harassment of her by Defendant Correia . . . ."  D. 1 ¶ 102; see D. 1 ¶ 112.  She, however, has not alleged any causal connection between an adverse employment action and her sex, nor did she include such an allegation in her MCAD complaint. Although she claims to have been "treated differently" due to sexual harassment, she offers no other information to support a disparate treatment claim, and the Court must disregard conclusory, non-factual allegations.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). Semmami also appears to concede in her opposition to the motion to dismiss that she lacks a factual basis to support a sex-based claim.  See D. 11 at 15 (stating that it is plausible actions taken against her were in retaliation for her complaints, but that "discovery may reveal evidence of gender discrimination").  The Court, therefore, allows Defendants' motion to dismiss as to Counts II and VI without prejudice.

### C.      Race/Religion/National Origin Discrimination (Counts III and VII)

Semmami asserts claims of race/religion/national origin discrimination and harassment against in violation of Title VII (Count III) and in violation of Mass. Gen. L. c. 151B, § 4 (Count VII) against UG2.

To state a claim for harassment under such federal or Massachusetts law, a plaintiff must show that her workplace was "'permeated with discriminatory intention, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Trent v. ADT Sec. Servs., Inc., Civ. A. No. 11-11912-RGS, 2013 WL 4512052, at *6 (D. Mass. Aug. 22, 2013) (quoting Harris, 510 U.S. at 21); see Sarin v. Raytheon Co., 905 F. Supp. 49, 52 (D. Mass. 1995) (explaining that the Chapter 151B standard for harassment mirrors the Title VII standard).  To this extent, Semmami has stated a claim in Counts III and IV.  Semmami has alleged that because she is Moroccan-Arab and Muslim, Correia "would make disparaging comments about [her] national origin [and] religion,"  D. 1 ¶ 50, and that Correia's actions adversely affected her in the workplace, D. 1 ¶ 124.  The Court concludes they are sufficient to state a plausible claim of unlawful harassment under "Title VII's broad rule of workplace equality," Harris, 510 U.S. at 22, and the mandate of Chapter 151B that its provisions "be construed liberally for the accomplishment of its purposes. . . ," Mass. Gen. L. c. 151B, § 9; see Cabi v. Bos. Children's Hosp., 161 F. Supp. 3d 136, 153-54 (D. Mass. 2016) (holding that allegations of supervisor's allegedly "frequent" and "regular" sex-based, race-based and national origin-based comments sufficed to survive a motion to dismiss plaintiff's Title VII harassment claim and listing cases).

To the extent Semmami asserts separate claims for disparate treatment as part of Counts III and VII, however, the Court allows Defendants' motion to dismiss those claims without prejudice.  "Under the burden shifting analysis applicable to both the federal [Title VII] and state [Chapter 151B] statutory regimes, [a] [p]laintiff must first establish a prima facie case of employment discrimination by demonstrating that (1) [s]he is a protected class member, (2) [s]he performed up to [the] [d]efendant's legitimate job expectations, and (3) [s]he suffered an adverse

job action." Allder v. Daniel O'Connell's Sons, 20 F. Supp. 2d 210, 215 (D. Mass. 1998) (citing

Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 760 (1st Cir. 1988)).  Here, Semmami has not

identified an adverse employment action related to her race, religion or national origin.  She alleges

that she was "not held to the same standards as her co-workers to her detriment," D. 1 ¶ 49, but

does not allege that any consequences resulted.  She therefore has not stated a plausible disparate

treatment claim in Counts III and VII, separate from her claims for race/religion/national origin

harassment which shall proceed.

### D.      Retaliation (Counts IV and VIII)

Semmami asserts claims of retaliation in violation of Title VII (Count IV) and Mass. Gen.

L. c. 151B, § 4(4) (Count VIII) against both UG2 and Correia.  Because "there is no individual

liability under Title VII," Fantini v. Salem State Coll., 557 F.3d 22, 31 (1st Cir. 2009), the Court

allows Defendants' motion to dismiss as to the Title VII claims against Correia under Count IV.

Title VII provides that "it shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because he has opposed any practice made an

unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  Under this retaliation

provision, a plaintiff must plead a prima facie case consisting of three elements:  (1) "that the

plaintiff engaged in an activity that is protected by the statute"; (2) "that the plaintiff suffered an

adverse employment action"; and (3) "a causal link between the protected activity and the adverse

employment action." Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011).  The same analysis

applies under the anti-retaliation provision of Chapter 151B. See Psy-Ed Corp. v. Klein, 459 Mass.

697, 707 (2011).

Semmami alleges that after she reported Correia and Ventura's behavior, Defendants

"illegally retaliated against [Semmami] by unjustly subjecting her to unjust scrutiny, false

allegations of misconduct and unwelcome and derisive comments solely because she had opposed [] discrimination." D. 1 ¶ 132. Defendants argue that Semmami's retaliation claim must fail because she did not have a "reasonable basis for inferring that the [conduct at issue] reflected" illegal discrimination or harassment. Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 226 (1st Cir. 2012). The Court rejects Defendants' argument for the same reasons the Court denies Defendant's motion to dismiss the Title VII sexual harassment claim. The Court also concludes that even setting aside the MCAD complaint, which Semmami brought against Janitronics rather than UG2, Semmami's reporting to UG2's Human Resources Department about Correia's alleged sexual harassment in October 2017 and January 2018 constitutes protected activity under Title VII. Semmami has also alleged that she was suspended and terminated shortly after meeting with Human Resources about Correia, which creates an at least plausible causal link between her protected activity and her termination. The Court, therefore, denies Defendants' motion to dismiss Semmami's Title VII retaliation claim against UG2.

The facts alleged in Semmami's complaint that give rise to a plausible Title VII retaliation claim against UG2, as discussed above, are equally sufficient to give rise to a plausible Chapter 151B retaliation claim against UG2. As to the Chapter 151B claim against Correia, Semmami has not tied any adverse employment action, including her suspension and termination, to any action taken by Correia. She also does not allege, beyond conclusory statements, that Correia's alleged sexual harassment was carried out in retaliation for her reporting the behavior. Rather, Semmami alleges that his sexual harassment was consistent before and after she reported it to Human Resources. The Court, therefore, denies Defendants' motion to dismiss Count VIII against UG2 but allows it as to Correia without prejudice.

### E.     Coercion, Intimidation, Interference and Threats (Count IX)

Semmami asserts a claim of coercion, intimidation, interference and threats in violation of

Mass. Gen. L. c. 151B, § 4(4A) (Count IX) against Correia.  Section 4A makes it unlawful "[f]or

any person to coerce, intimidate, threaten, or interfere with another person in the exercise or

enjoyment of any right granted or protected by [Chapter 151B] . . . ."  To establish a claim for

interference under Mass. Gen. L. c. 151B, § 4(4A), Semmami must show that Correia interfered

with her rights under the statute "in deliberate disregard of those rights."  Furtado v. Standard

Parking Corp., 820 F. Supp. 2d 261, 278 (D. Mass. 2011) (citing Canfield v. Con-Way Freight,

Inc., 578 F. Supp. 2d 235, 242 (D. Mass. 2008)).  Semmami alleges that "Defendants coerced,

intimidated, and threatened [Semmami], and interfered with [Semmami's] exercise and enjoyment

of her rights to a reasonable accommodation and to be free from discrimination and retaliation,"

D. 1 ¶ 167, but these allegations "do[] not follow from any factual content set out in the pleading

or any reasonable inference therefrom."   Morales-Cruz, 676 F.3d at 226 (emphasis in original).

In other words, Semmami has listed the elements of a coercion claim under Chapter 151B, but she

has not alleged any facts to support those elements.  To the extent Semmami relies on harassment

from co-workers other than Correia in late 2017 (such as the co-worker who pushed her) to support

her claims, those allegations are immaterial because Semmami has not tied the behavior of those

co-workers to Correia.  The Court, therefore, allows Defendants' motion to dismiss Count IX.

### F.     Aiding and Abetting a Violation of Mass. Gen. L. c. 151B (Count X)

Semmami asserts claims of aiding and abetting a violation of Mass. Gen. L. c. 151B, § 4(5)

(Count X) against UG2 and Correia.  Mass. Gen. L. c. 151B, § 4(5) makes it unlawful "[f]or any

person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing

of any of the acts forbidden under [Chapter 151B] or to attempt to do so."  Claims under Chapter

151B are "derivative" of underlying discrimination claims, so there can be no liability for aiding

and abetting discrimination absent a meritorious underlying claim of discrimination.  Abramian v.

President & Fellows of Harvard Coll., 432 Mass. 107, 122 (2000).  To prevail on a claim for aiding

and abetting under Chapter 151B, a complainant must demonstrate (1) a "wholly individual and

distinct wrong" that "was committed by the proposed or named individual respondent(s)," which

"must be separate and distinct from the claim in main," and (2) that the "aider or abettor shared an

intent to discriminate not unlike that of the alleged principal offender, and that the aider or abettor

knew of his or her supporting role in an enterprise designed to deprive an individual of a right

guaranteed him or her under G.L. c. 151B."  Harmon v. Malden Hosp., 19 Mass. Discrim. L. Rep.

157, 158 (Mass. Comm'n Against Discrimination 1997) (Single Comm'r); see Planned Parenthood

League of Mass., Inc. v. Blake, 417 Mass. 467, 481 (1994) (holding, in a different context, that

"any violator of the prohibition against aiding or abetting in [a court injunction (as opposed to

Chapter 151B)] must share the mental state of the principal violator"); Beaupre v. Cliff Smith &

Assocs., 50 Mass. App. Ct. 480, 495 n.23 (Mass. App. Ct. 2000) (holding that defendant must "be

found to have had the requisite intent to discriminate in order to be liable for aiding and abetting"

under Chapter 151B).

Here, the Court has already determined that Semmami has stated a plausible claim for

underlying discrimination by Correia, for which UG2 may be liable.  Semmami has also alleged

that UG2 knew about Correia's harassment and either failed to act or conducted a sham

investigation, enabling the behavior to continue.  See Zhao v. Bay Path Coll., 982 F. Supp. 2d 104,

115-16 (D. Mass. 2013) (denying motion to dismiss an aiding and abetting claim against defendant

employer and employee where plaintiff alleged that the employer "refused to adequately

investigate her claims" of harassment and discrimination by the employee); Fisher v. Town of

Orange, 885 F. Supp. 2d 468, 477 (D. Mass. 2012) (holding that plaintiff had pleaded sufficient facts showing "joint activity" to survive motion to dismiss aiding and abetting discrimination claim, despite not being "models" of proper pleading).   Furthermore, as discussed above, Semmami has alleged sufficient facts to raise the inference that Correia intended to discriminate against her, satisfying the intent requirement under Section 4(5).   The Court, therefore, declines to dismiss the aiding and abetting claim and denies Defendants' motion to dismiss Count X.

### G.      Negligence – Negligent Hiring and Supervision (Count XI)

Semmami asserted a claim of negligent hiring and supervision against UG2 but does not oppose UG2's motion to dismiss the claim.   D. 11 n.1 (stating that "Plaintiff does not oppose dismissal of Count 11").   Accordingly, the Court allows Defendants' motion to dismiss Count XI.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 6, with respect to Counts II and VI (and as much of Counts III and VI as alleged disparate treatment) without prejudice, IV and VIII (retaliation against Correia only) without prejudice, IX (coercion, intimidation, interference and threats) and XI (negligence).   The Court DENIES the motion with respect to Counts I and V (hostile work environment claim), III and VII (to extent that they allege race/religion/national origin harassment), IV and VIII (retaliation against UG2 only) and X (aiding and abetting) and these claims may proceed.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge