**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ) | |
| **CHAMA SEMMAMI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 18-12396** |
| ) | |
| **UG2 LLC and AGOSTINHO** ) | |
| **CORREIA,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                              **March 22, 2021**

## I.    Introduction

Plaintiff Chama Semmami ("Semmami") has filed this lawsuit against Defendants UG2 LLC ("UG2") and Agostinho Correia ("Correia") (collectively, "Defendants") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), and Mass. Gen. L. c. 151B ("Chapter 151B").  D. 1.  Defendants move for summary judgment, D. 82, and seek to strike portions of Semmami's deposition errata sheet, D. 74.  For the reasons discussed below, the Court DENIES Defendants' motion to strike, D. 74, and ALLOWS in part and DENIES in part Defendants' motion for summary judgment, D. 82.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the

1

outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation marks omitted).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.  Factual Background

The following facts are undisputed unless otherwise noted and are drawn from the parties' submission of material facts, D. 84, D. 92.  UG2 is a services company that provides janitorial, maintenance and other services for office buildings and other facilities.  D. 84 ¶ 1; D. 92 ¶ 1. Semmami worked at the Athenahealth/Arsenal on the Charles site ("Athenahealth Site") for a company called UNICCO before joining Janitronics in March 2014.  D. 84 ¶ 2; D. 92 ¶ 2.

### 1.   Sexual Harassment Allegations

Semmami testified that Correia, her supervisor at UG2, sexually harassed her from 2014 through May 2017.  D. 84 ¶ 10; D. 92 ¶ 10.  On or about August 22, 2017, Semmami filed a complaint against Janitronics and Correia with the Massachusetts Commission Against Discrimination ("MCAD"), in which she alleged that Correia discriminated against her based on race, national origin and religion, "favored Cape Verdeans and Hispanics" and treated Semmami disparately in terms of hours and other terms and conditions of employment.  D. 84 ¶ 11; D. 92 ¶

11.  In the complaint, Semmami alleged that "[i]n or around September 2016, Mr. Correia cut [her] hours from 28 per week to 20," and that when she complained to her union, Correia told her "he would transfer [her] if [she] wanted but [she] declined."  Id.

    *2. September 2017 Incident*

UG2 won the Athenahealth contract effective September 1, 2017, after which Semmami and all other cleaners at the site, including Correia and Alexi Ventura ("Ventura"), became UG2 employees.  D. 84 ¶ 3; D. 92 ¶ 3.  Correia was Semmami's manager for the entirety of Semmami's tenure at Janitronics.  D. 84 ¶ 7; D. 92 ¶ 7.  Ventura was the Athenahealth site supervisor and worked under Correia during Semmami's tenure at Janitronics.  D. 84 ¶ 8; D. 92 ¶ 8.  Semmami was assigned to clean several Athenahealth Site buildings under Janitronics.  D. 84 ¶ 6; D. 92 ¶ 6. The daily routine for Semmami and the other cleaners remained the same at Janitronics and UG2. D. 84 ¶ 9; D. 92 ¶ 9.

On or about September 15, 2017, Ventura yelled at Semmami about a coffee stain. Semmami believes Correia directed Ventura to yell at Semmami in an attempt to upset Semmami to produce grounds for termination.  D. 84 ¶ 17; D. 92 ¶ 17.  In an October 18, 2017 meeting related to this incident, Semmami spoke with Carol Ambler ("Ambler"), UG2's Human Resources Manager.  D. 84 ¶ 23; D. 92 ¶ 23.  On October 20, 2017, Semmami submitted a letter to UG2's Human Resources Department ("HR"), requesting a transfer to a full-time position close to her home.  D. 84 ¶ 26; D. 92 ¶ 26.  The letter referenced that she had been discriminated against by her former manager and supervisor.  Id.  Ambler and Olga Suazo Marin ("Suazo"), a UG2 Human Resources Administrator, interviewed Correia and Ventura on October 13 and October 26, 2017. D. 84 ¶ 27; D. 92 ¶ 27.  During the interview, Correia described Semmami as a difficult employee who would not take direction from him or Ventura.  Id.  Ventura claimed that Semmami yelled at

him when he approached her about the coffee stain on September 15, 2017, and that he "shushed" her given the other Athenahealth employees nearby.  Id.  Following the interviews, Ambler determined there was no Equal Employment Opportunity issue, as the confrontation was deemed a personality or interpersonal conflict that did not involve harassment or discrimination.  D. 84 ¶ 28; D. 92 ¶ 28.  Ambler attempted to find a full-time position for Semmami at another site but was unsuccessful in doing so.  D. 84 ¶ 29; D. 92 ¶ 29.  Following the investigation, in November 2017, Semmami told Suazo that Correia had looked at her up and down with, what Suazo called, "elevator eyes."  D. 84 ¶ 31; D. 92 ¶ 31.

### 3.    Semmami's Suspension and Termination

In December 2017, Correia and one of the UG2 cleaners at the Athenahealth site, Francisco Sevilla ("Sevilla") reported to Robert Desaulniers ("Desaulniers"), Correia's manager, that Semmami was acting in a verbally and physically inappropriate manner towards co-workers.  D. 84 ¶ 42; D. 92 ¶ 42.  Desaulniers reached out to Ambler to tell her about the report.  D. 84 ¶ 43; D. 92 ¶ 43.  On December 11, 2017, at Ambler's request, Desaulniers sent Ambler a list of names and telephone numbers he received from Correia.  D. 84 ¶ 45; D. 92 ¶ 45.  On December 15, 2017, a cleaner from the Athenahealth site, Renan Reyes ("Reyes"), went to UG2's headquarters in Boston to report to Ambler that Semmami, on December 14, 2017, had allegedly called her coworkers dogs and raised her middle finger at them.  D. 84 ¶ 47; D. 92 ¶ 47.  Reyes reported that when he confronted Semmami about her behavior, Semmami responded by saying, "I am a woman and you are a faggot . . ."  Id.  Following the alleged incident, Ambler decided to suspend Semmami, without pay, pending further investigation.  D. 84 ¶ 49; D. 92 ¶ 49.

Ambler interviewed three other co-workers from the Athenahealth site who reported that Semmami had made other inappropriate or offensive comments.  D. 84 ¶ 52; D. 92 ¶ 52.  On

December 17, 2017, Reyes wrote a statement describing the incident in which Semmami allegedly insulted him.  D. 84 ¶ 55; D. 92 ¶ 55.  In late December, Ambler provided the witness interview notes and Reyes' statement to her supervisor, George Keches ("Keches").  D. 84 ¶ 58.  On January 2, 2018, Ambler and another HR representative interviewed Semmami.  D. 84 ¶ 60; D. 92 ¶ 60.  At the interview, Semmami denied using the word "faggot" and stated her belief that the co-worker complaints were orchestrated by Correia.  D. 84 ¶ 61; D. 92 ¶ 61.

Ultimately, Ambler met with Keches and Walter Crow ("Crow"), UG2's outside General Counsel, and collectively decided the allegations against Semmami were sufficiently corroborated.  D. 84 ¶ 69; D. 92 ¶ 69.  Keches, who had the final decision-making authority in the matter, decided that Semmami should be terminated.  D. 84 ¶ 70; D. 92 ¶ 70.  Semmami was terminated on January 24, 2018.  D. 84 ¶ 71; D. 92 ¶ 71.

**IV.    Procedural History**

Semmami instituted this action on November 16, 2018.  D. 1.  Defendants moved to dismiss on January 18, 2019.  D. 6.  The Court allowed the motion to dismiss in part and denied in part. D. 17.  The Court allowed Defendants' motion to dismiss with respect to Counts II and VI (and as much of Counts III and VI as alleged disparate treatment) without prejudice, Counts IV and VIII (retaliation against Correia only) without prejudice, Count IX (coercion, intimidation, interference and threats) and Count XI (negligence).  D. 17.  Semmami subsequently withdrew Counts III and VII (race/religion/national origin harassment claim).  Accordingly, her remaining claims are the Counts I and V (hostile work environment against UG2 only), Counts IV and VIII (retaliation against UG2 only) and Count X (aiding and abetting against UG2 and Correia).  Id.  The Court heard the parties on Defendants' motion for summary judgment on the remaining claims and their motion to strike the deposition errata sheet and took these matters under advisement.  D. 95.

5

## V.      Discussion

### A.      Motion to Strike

Defendants ask the Court to strike portions of Semmami's errata sheet, relating to Day 1 of her deposition, September 25, 2019, in which she testified that no sexual harassment occurred at UG2 beyond a single instance in which Correia stared at her.  D. 74 at 1.  Pursuant to Fed. R. Civ. P. 30(e), a deponent must be given "30 days after being notified . . . that the [deposition] transcript or recording is available in which:  (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement [often called an errata sheet] listing the changes and the reasons for making them."  Fed. R. Civ. P. 30(e)(1).  Defendants contend that Semmami's errata sheet should be struck because it was untimely and it included statements that contradict her deposition testimony.  D. 74 at 1-2.

As to the timeliness of Semmami's errata sheet, it appears that Semmami sent it to Defendants' counsel on June 29, 2020, nine months after the date of Day 1 of Semmami's deposition.  D. 75 at 6.  Semmami explains that this untimeliness was in large part due to the COVID-19 pandemic and the restrictions that stemmed therefrom, preventing Semmami, who requires an Arabic interpreter, from meeting with her counsel and interpreter in person.  D. 81 at 16-17.  According to Semmami, she, her counsel and an interpreter had to meet over the phone to review the document, thereby limiting their ability to submit the errata sheet by the deadline.  Id. Given the extenuating circumstances presented by the COVID-19 pandemic, the Court will treat the errata sheet as timely.

As to the errata sheet's contradictory statements, Rule 30(e) explicitly states that changes may be "in form or substance."  Fed. R. Civ. P. 30(e)(1)(B).  "The rule does not appear to preclude changes that contradict the actual testimony."  Eswarappa v. Cmty. Action Inc./Head Start, No.

14-cv-14255-FDS, 2017 WL 3202724, at *5 (D. Mass. July 27, 2017) (citing Elwell v. Conair, Inc., 145 F. Supp. 2d 79, 86 (D. Me. 2001) (noting that "Rule 30(e) allows deponents to provide revised answers to deposition questions, including answers contradictory to those provided at the deposition")).  "[C]hanged deposition answers of any sort are permissible."  Tingley Sys., Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 120 (D. Mass. 2001) (citing Hawthorne Partners v. AT & T Technologies, Inc., 831 F. Supp. 1398 (N.D. Ill. 1993) (noting that Rule 30(e) allows witness to change testimony, even to contradict original testimony, so long as he or she provides a reason, regardless of whether said reason is convincing)).  Semmami has explained the reasons for the changes, indicating that she was distressed during the deposition, "sitting in the room across from her alleged harasser," had difficulty discussing the sexual harassment "as a Muslim woman," and experienced issues with the translation.  D. 81 at 5-6, 14-15.  She claims that following Day 1 of the deposition, she realized the mistake she had made and corrected her statements on Day 2 of the deposition, explicitly stating that she was harassed at UG2.  Id. at 14-15.  Semmami additionally presents evidence to support her assertion that the statements made on Day 1, in which she testified that the harassment did not occur at UG2, were a mistake.  The evidence includes a security report from 2017 that references instances in which Semmami approached security officers regarding Correia's behavior, including an instance in which Semmami allegedly mentioned to the officer that "her boss asked her to go to a motel with him," D. 81-5, as well as Semmami's MCAD charge, dated February 2018, which stated that her "Manager" would "come to [her] worksite and harass [her]," D. 81-6 at 3.

Under Fed. R. Civ. P.  30(e), "[t]he deponent may make any corrections, substantive or procedural, but corrected deposition answers do not serve to wipe the slate clean with respect to the witness's earlier testimony which is available for use as impeachment evidence at trial."

Chaplin ex rel. Chaplin v. Quinn, No. 2002-cv-1492B, 2004 WL 51819, at *3 (Mass. Super. Jan. 13, 2004); see Smaland Beach Ass'n, Inc. v. Genova, 461 Mass. 214, 230 (2012) (noting that "because the text of rule 30(e) does not require that the original answers of the deponent be struck, the original answers remain part of the record and may be read, along with the changed answers and reasons provided for the change, at trial").  Accordingly, the motion to strike the errata sheet, D. 74, is denied, but certainly such changes by Semmami between Day 1 and Day 2 of her deposition will be the subject of impeachment at trial.

## B.    Sexual Harassment Claims Against UG2 (Counts I and V)

Semmami presses sexual harassment claims against UG2 pursuant to Title VII and Mass. Gen. L. c. 151B, § 4(16A).  Title VII and Mass. Gen. L. c. 151B protect employees from sex-based employment discrimination, including sexual harassment.  See Gerald v. Univ. of P.R., 707 F.3d 7, 17 (1st Cir. 2013);  Lowery v. Klemm, 446 Mass. 572, 574 (2006).  The showing required under Title VII is "essentially analogous" to that of 151B.  Bourbeau v. City of Chicopee, 445 F. Supp. 2d 106, 111 (D. Mass. 2006) (citing Brissette v. Franklin County, Sheriff's Office, 235 F. Supp. 2d 63, 84 (D. Mass. 2003)) (internal quotation marks omitted).[1]  Semmami's claims against UG2, brought under the theory of hostile work environment, can succeed only if she is able to show:  (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) "that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment"; (5) "that sexually objectionable conduct was both objectively and subjectively

---

[1]Accordingly, the Court will "apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. Ch. 151B."  Thirkield v. Neary & Hunter OB/GYN, LLC, 76 F. Supp. 3d 339, 349 (D. Mass. 2015) (quoting Wheatley v. Am. Tel. & Tel. Co., 418 Mass. 394, 397 (1994)).

offensive, such that a reasonable person would find it hostile or abusive" and that Semmami in fact did perceive it to be so; and (6) that some basis for employer liability has been established. Ponte v. Steelcase Inc., 741 F.3d 310, 319–20 (1st Cir. 2014) (internal citation and quotation marks omitted).   Semmami "must present sufficient evidence to demonstrate that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an[ ] abusive working environment.'"   Baer v. Montachusett Reg'l Tech. Sch. Dist., 380 F. Supp. 3d 143, 150 (D. Mass. 2019) (quoting Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 43 (1st Cir. 2011) (first alteration and omission in original)).   "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment' to show an objectively hostile or abusive workplace environment."   Id.   (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)) (internal quotation marks omitted).

Defendants do not dispute that Semmami is a member of a protected class, but rather, dispute whether Semmami has produced evidence sufficient to survive summary judgment on the remaining elements of a viable hostile work environment claim and whether the acts alleged meet the standard's required severity level.   See Ponte, 741 F.3d at 320.   Semmami cites in her deposition multiple accounts of sexual harassment, detailing instances in which Correia would touch her, stare at her in a dark room and perform sexually inappropriate actions.   See D. 91-1 at 287:3-302:23.   Such acts included Correia allegedly touching Semmami while touching his own private area.   Id. at 307:3-7; 310:20-311:19.   While Semmami testified as to these acts of sexual harassment on Day 2 of her deposition, on Day 1, Semmami testified that the sole act of harassment that occurred at UG2 was Correia allegedly watching her from a dark room.   Id. at 29:11-30:1.

9

Defendants ask the Court to conclude that Semmami's altered testimony on Day 2 of the deposition undermines her credibility and renders all evidence therefrom so contradictory that "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to [her] allegations."  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).  The Court does not agree.  In addition to her Day 2 testimony, Semmami presents other evidence that supports that she previously had made allegations that sexual harassment by Correia occurred at UG2.  Such evidence includes but is not limited to, in addition to security reports, D. 81-5, and the MCAD charge, D. 81-6, an email from Suazo, dated January 2, 2018, in which Suazo writes that Semmami told her "things were not getting any better" and that Correia "continues to stare at her with elevator eyes."  Id. at UG000122.  Semmami provides testimony from fellow employee, Jorge Padilla ("Padilla") that Semmami had told him about Correia's allegedly inappropriate behavior, including touching his private area while in front of Semmami, D. 91-4 ("Padilla Dep.") at 38:14-23, and that Semmami told Padilla the situation remained the same once they were UG2 employees, id. at 44:19-45.  Accordingly, although disputed by UG2 and subject to impeachment at trial based upon her Day 1 deposition testimony, Semmami's Day 2 deposition testimony is sufficient for a reasonable factfinder to conclude that Semmami was subjected to sexual harassment, that the harassment was based on sex and that the harassment was both objectively and subjectively offensive.  Semmami has met her burden on the second, third and fifth elements of a hostile work environment claim.

Turning to the fourth and sixth elements, "[t]here is 'no mathematically precise test' that a reviewing court employs to answer the question of severity and pervasiveness, 'but several factors, none of which are individually determinative, are relevant:  the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's

work performance.'" <u>Thirkield v. Neary & Hunter</u>, 76 F. Supp. 3d 339, 346 (D. Mass. 2015) (quoting <u>Gerald</u>, 707 F.3d at 18). "[A] mere 'single act of harassment may, if egregious enough, suffice to evince a hostile work environment . . .'" <u>Id.</u> (quoting <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 48 (1st Cir. 2008)). "'[B]ehavior like fondling, come-ons, and lewd remarks is often the stuff of hostile work environment claims.'" <u>Id.</u> Semmami testified that Correia touched her inappropriately, both at Janitronics and at UG2. D. 91-1 at 302:2-20, 307:3-24, 310:18-311:23. Taken together and viewing the evidence in the light most favorable to the non-moving party, a reasonable factfinder could conclude that the harassment Semmami allegedly experienced was sufficiently severe and pervasive for purposes of her claim.

The sixth element of Semmami's hostile work environment claim requires that Semmami establish a basis for employer liability. Under Title VII, an employer may be subject to vicarious liability for sexual harassment by an employee's supervisor, an individual "empowered by the employer to take tangible employment actions against the victim." <u>Fisher v. Town of Orange</u>, 964 F. Supp. 2d 103, 115 (D. Mass. 2013) (quoting <u>Vance v. Ball State Univ.</u>, 570 U.S. 421, 424 (2013)) (internal quotation marks omitted). However, "the employer may prevail if it demonstrates a two-part affirmative defense: that its own actions to prevent and correct harassment were reasonable and that the employee's actions in seeking to avoid harm were not reasonable." <u>Nieves-Borges v. El Conquistador P'ship, L.P., S.E.</u>, 936 F.3d 1, 6 n.8 (1st Cir. 2019) (quoting <u>Chaloult v. Interstate Brands Corp.</u>, 540 F.3d 64, 66 (1st Cir. 2008)). Similarly, "chapter 151B makes employers vicariously liable for hostile work environments created by supervisors." <u>Noviello v. City of Bos.</u>, 398 F.3d 76, 95 (1st Cir. 2005) (quoting <u>Coll.-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination</u>, 400 Mass. 156, 162 (1987)). Unlike Title VII, however, chapter 151B "does not afford employers any affirmative defenses to liability." <u>Id.</u>

"Based on the legislative mandate that chapter 151B must be construed liberally to effectuate its purposes, the [Supreme Judicial Court] has endorsed a rule that holds employers strictly liable for supervisory harassment." Id. (citing Mass. Gen. L. c. 151B, § 9).

Semmami brings claims against UG2 under both Title VII and Chapter 151B. It is undisputed that Correia was Semmami's supervisor. D. 84 ¶ 26; D. 92 ¶ 26. Accordingly, Semmami presents sufficient evidence pursuant to Chapter 151B and there is a basis for employer liability given Correia's position at the company. See Newell v. Celadon Sec. Servs., Inc., 417 F. Supp. 2d 85, 93 (D. Mass. 2006) (noting that "where an employer has conferred supervisory authority on an employee, regardless of the actual title given the employee, there may be strict liability on the part of the employer even if the supervisor is not the victim's direct supervisor"). Under Title VII, however, "[w]hen sexual harassment by a supervisor does not culminate in a tangible employment action, a defending employer may raise an affirmative defense to liability, subject to 'proof by a preponderance of the evidence.'" MacDougall v. Potter, 431 F. Supp. 2d 124, 131 (D. Mass. 2006) (quoting Faragher, 524 U.S. at 807). Under this defense, known as the *Faragher/Ellerth* defense, "[f]irst, the employer must show that it 'exercised reasonable care to prevent and correct promptly' the harassment," and "[s]econd, the employer must show that the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Noviello, 398 F.3d at 94 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)). Semmami testified that she requested a transfer given the alleged harassment by Correia and that the transfer did not occur. D. 91-1 at 138:3-19. She additionally relies upon testimony from Ambler that Semmami had informed Ambler of Correia's "sexual harassment" at Janitronics during an interview and Semmami was not

removed from his supervision.  D. 91-6 at 138:13-21.  A reasonable fact finder could conclude that there is a basis for employer liability under both Title VII and Chapter 151B.

The issues raised by UG2 as to whether Semmami has presented sufficient evidence as to whether she was sexually harassed at UG2 are largely factual in nature and best left to the consideration of the factfinder at trial.  Accordingly, the motion for summary judgment is denied as to Counts I and V.

### C.    Aiding and Abetting Claim Against Correia and UG2 (Count X)

Chapter 151B provides that individuals may be held liable for aiding or abetting discriminatory conduct prohibited under the chapter.  Morehouse v. Berkshire Gas Co., 989 F. Supp. 54, 61 (D. Mass. 1997).  Mass. Gen. L. c. 151B, § 4(5) provides that it is unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."  Mass. Gen. L. c. 151B, § 4(5).  Section 4(4A) prohibits "any person" from interfering "with another person in the exercise or enjoyment of any right granted by this chapter."  Mass. Gen. L. c. 151B, § 4(4A).  Accordingly, "chapter 151B 'applies not only to employers acting through their principals and agents, but also to any person who aids or abets discriminatory or retaliatory conduct prohibited under [Mass. Gen. L. c.] 151B, as well as to any person who interferes with another's right to work free of unlawful discrimination and retaliation.'"  Morehouse, 989 F. Supp. at 61 (quoting Ruffino v. State St. Bank & Tr. Co., 908 F. Supp. 1019, 1048 (D. Mass. 1995)).

Defendants argue there can be no liability for aiding and abetting discrimination absent a meritorious underlying claim of discrimination.  A factfinder, however, could reasonably conclude that Correia's alleged conduct was sufficiently severe and pervasive to alter the conditions of Semmami's employment and create a hostile work environment in violation of Chapter 151B.  See,

e.g., id.  Accordingly, because Semmami has presented sufficient evidence to survive summary judgment on her hostile environment claim, Correia and UG2 can be held liable under Mass. Gen. L. c. 151B, § 4 as to said claim.

### A.      Retaliation Claims Against UG2 (Counts IV and VIII)

Semmami alleges, pursuant to Title VII and Mass. Gen. L. c. 151B, § 4, that Defendants "illegally retaliated against [Semmami] by unjustly subjecting her to unjust scrutiny, false allegations of misconduct and unwelcome and derisive comments solely because she had opposed the aforementioned discrimination."  D. 1 ¶ 132.  To assert a retaliation claim under Title VII, Semmami must show that she engaged in a protected activity and that she subsequently suffered some materially adverse action causally linked to her protected activity.  Collazo v. Bristol–Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010).  A "materially adverse" action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).  "If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to 'articulate a legitimate, non-retaliatory reason' for its conduct."  Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 31 (1st Cir. 2011) (quoting Collazo, 617 F.3d at 46).  If the defendant can meet that burden, the plaintiff must "show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus."  Roman v. Potter, 604 F.3d 34, 39 (1st Cir. 2010) (quoting Enica v. Principi, 544 F.3d 328, 343 (1st Cir. 2008)) (internal quotation marks omitted).[2]

---

[2]"As neither party has identified meaningful distinction between Title VII and c. 151B that would affect the outcome here, we do not provide separate analysis for the c. 151B [retaliation] claims."

UG2 urges the Court to grant summary judgment on Semmami's retaliation claim, arguing that Semmami cannot establish a causal nexus between her complaints and subsequent termination and cannot show that UG2's reason for firing her was pretextual.  The sole evidence Semmami relies upon as probative of a causal connection between her claimed protected activity and alleged retaliatory action is the temporal sequence of events, emphasizing that she was terminated "within weeks of her complaints."  D. 93 at 20.  "[A]n inference of retaliation may arise where '[a] showing of [adverse action] . . . soon after the employee engages in protected activity specifically protected by section 704(a) of Title VII . . . is indirect proof of a causal connection between the [adverse action] . . . and the activity because it is strongly suggestive of retaliation.'"  Ruffino, 908 F. Supp. at 1044 (quoting Oliver v. Digital Equip. Corp., 846 F.2d 103, 111 (1st Cir. 1988)); see Mole v. University of Mass., 442 Mass. 582, 592 (2004) (noting that "if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible").

Even if the Court considers both Semmami's August 2017 MCAD complaint (and her complaint in Fall 2017 with respect to Correia staring at her and sitting suggestively) as her protected activity and considers the months-long lapse between these complaints and Semmami's termination in December 2017 sufficient to produce a rebuttable presumption, Semmami presents no evidence to negate UG2's non-discriminatory reasons for her termination.  UG2 presents multiple co-workers' reports stating that Semmami had engaged in misbehavior, including one employee's report that Semmami called him a "faggot."  D. 82-1 at ¶ 25.  Another person, Keches, was consulted following this report as to whether to suspend Semmami pending further

---

Baer v. Montachusett Reg. Techn. Sch. Dist., 380 F. Supp. 3d 143, 152 n.2 (D. Mass. 2019) (quoting Xiaoyan Tang v. Citizens Bank, NA, 821 F.3d 206, 215 n.9 (1st Cir. 2016)).

investigation.  Id. ¶ 27; D. 82-6 ¶¶ 5-6.  Ambler interviewed additional co-workers who reported

witnessing other instances in which Semmami insulted colleagues, including another instance in

which Semmami allegedly called a coworker a dog.  D. 82-1 at ¶ 31.  Semmami claims these

reports were a concerted effort on the part of UG2 and Correia to have her removed but presents

no evidence beyond an inference stemming from the timing of her termination.  UG2 asserts that

it determined, based upon the evidence gathered from the investigations into Semmami's alleged

conduct that there was proper cause to terminate Semmami's employment.   Attacking the

completeness of the investigation, without factual basis, does not save Semmami's retaliation

claim, Murray v. Kindred Nursing Ctrs. W., LLC, 789 F.3d 20, 27 (1st Cir. 2015).  This is

particularly true in the absence of a nexus between the protected activity and Semmami's

termination and in light of the independent decisionmaking that resulted in that termination.

Culhane v. Baystate Med. Ctr., Inc., 69 Mass. App. Ct. 1106, 2007 WL 1630093, at * 5 (2007);

Chiaretto v. Starwood Hotels and Resorts Worldwide, Inc., 699 F. Supp. 2d 347, 350, 356 (D.

Mass. 2010).   Moreover, while Semmami may allege that Correia brought employees to

Desaulniers to complain about Semmami, D. 92 ¶ 42, it is undisputed that Correia was not a

decision-maker in Semmami's termination process, nor is there any evidence thereof.  See D. 84

¶ 72; D. 82-1 ¶ 42; D. 82-6 ¶¶ 14-15.  Accordingly, Semmami fails to offer sufficient evidence to

show that her termination was causally linked to protected activity.  The Court allows Defendants'

motion for summary judgment as to Counts IV and VIII.

## VI.     Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion to strike, D. 74, and

ALLOWS in part and DENIES in part Defendants' motion for summary judgment, D. 82.

Accordingly, Counts IV and VIII (retaliation against UG2) are DISMISSED and Counts I and V

(hostile work environment claims against UG2 only) and Count IX (aiding and abetting claim against both Defendants) survive.

      **So Ordered.**

/s/ Denise J. Casper
United States District Judge
